**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

**DIANE NGUYEN, individually and on behalf of all others similarly situated,**
**Plaintiff,**

**v.** **Case No. 4:24-cv-00815-LPR**

**SAVAGE ENTERPRISES, et al.,**
**Defendants.**

---

**PLAINTIFF'S BRIEF IN SUPPORT OF RESPONSE IN OPPOSITION TO DEFENDANT SAVAGE ENTERPRISES' MOTION TO DISMISS THIRD AMENDED COMPLAINT**

**COMES NOW** Plaintiff, by and through her undersigned counsel, and submits this Brief in Support of Response in Opposition to Defendants' Motion to Dismiss the Third Amended Complaint, and respectfully shows the Court as follows:

## INTRODUCTION

Defendant Savage Enterprises ("Savage") seeks dismissal of Plaintiff Diane Nguyen's Third Amended Complaint ("TAC") by characterizing the allegations as conclusory and insufficient under Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6). Savage argues that testing variability and compliance with federal hemp regulations absolve it of liability. However, Plaintiff's TAC contains detailed factual allegations demonstrating that Savage's products exceeded the permissible Delta-9 THC threshold, rendering them unsafe, unlawful, and misleading to consumers. *See* 7 C.F.R. § 990.1; 21 U.S.C. § 802(16)(B); Ark. Code Ann. § 2-15-413.

The Agricultural Improvement Act of 2018 ("Farm Bill") defines legal hemp as containing no more than 0.3% Delta-9 THC on a dry weight basis, distinguishing it from federally controlled marijuana. Plaintiff's TAC alleges that Savage marketed vape products as legal hemp while knowingly distributing products that contained THC concentrations exceeding legal limits. These misrepresentations were delivered via Certificates of Analysis ("COAs") designed to induce consumer reliance and evade regulatory oversight (TAC ¶¶ 80–85). Courts recognize that COAs disseminated to support false compliance claims can serve as fraudulent tools in schemes to defraud consumers. *See In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, 590 F. Supp. 2d 1282, 1288 (C.D. Cal. 2008).

Savage's attempt to reframe these allegations as "routine business communications" ignores case law recognizing that consumer-facing misrepresentations designed to induce purchases are actionable. *See Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 885 (10th Cir. 2017). Similarly, the Second Circuit has held that the economic harm suffered from purchasing misrepresented products constitutes injury to "business or property" under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 137 (2d Cir. 2023).

The TAC satisfies the heightened pleading standard for fraud under Rule 9(b) by identifying the "who, what, when, where, and how" of Savage's fraudulent

conduct. Plaintiff alleges that Savage issued COAs with false THC readings and distributed those COAs via electronic communications to induce consumers to purchase non-compliant products (TAC ¶¶ 92–97). Courts have consistently held that fraudulent communications through mail or electronic means, when aimed at inducing consumer reliance, are sufficient predicate acts for RICO claims. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008).

Plaintiff's claims under RICO, the Magnuson-Moss Warranty Act, the Arkansas Deceptive Trade Practices Act, and product liability law are not only plausible but are substantiated by extensive factual content. Plaintiff alleges economic damages, including the purchase price of mislabeled vape products, which were unfit for lawful use (TAC ¶¶ 135–138). Accordingly, the Court should deny Savage's motion to dismiss and allow this case to proceed to discovery.

## LEGAL STANDARD

When A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint, not the merits of the plaintiff's claims. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, the complaint must allege sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *See id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard does not require a showing of probability, only that the pleaded facts permit a reasonable inference of liability. *Iqbal*, 556 U.S.

at 678. The court must "accept as true all facts pleaded by the non-moving party and draw all reasonable inferences in their favor." *McDonough v. Anoka Cnty.*, 799 F.3d 931, 945 (8th Cir. 2015).

For claims involving allegations of fraud, Rule 9(b) imposes a heightened pleading standard, requiring plaintiffs to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This standard is satisfied where the complaint alleges the "who, what, when, where, and how" of the fraudulent conduct. *See United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). However, Rule 9(b) must be read in harmony with Rule 8, and plaintiffs need not prove their claims at the pleading stage. *See Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009). Courts recognize that specific details—such as internal communications or exact dates—may remain unavailable until discovery. *See Schatz v. Rosenberg*, 943 F.2d 485, 496 (4th Cir. 1991) (noting that fraud pleading standards do not require plaintiffs to possess inside knowledge unavailable pre-discovery).

In addition, dismissal is improper if the complaint alleges facts that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Eighth Circuit has cautioned against dismissing RICO claims at the pleading stage where plaintiffs have provided specific factual allegations indicating the defendants' intent to defraud. *See Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066,

1070 (8th Cir. 1995). The Court must resolve all doubts in favor of the non-moving party at this early stage of litigation.

Given these principles, Plaintiff's detailed allegations of Savage's dissemination of fraudulent COAs and deceptive marketing to induce consumer purchases satisfy the Rule 9(b) and Rule 12(b)(6) pleading requirements. Accordingly, dismissal at this stage is unwarranted.

## FACTUAL BACKGROUND

### I. Hemp Testing Regulation and Testing

Defendants Defendants assert that hemp product testing is heavily regulated under federal and state laws, particularly focusing on Delta-9 THC testing on a "dry weight basis," and argue that some variability in the testing process permits compliance with these regulations (MTD p. 10–12). However, this argument fails to address the compliance of specific products alleged in the TAC. Federal and Arkansas regulations require that Delta-9 THC content in hemp not exceed 0.3%, regardless of its form (TAC ¶ 20). This standard, codified in the Agricultural Improvement Act of 2018 ("Farm Bill"), *see* 7 U.S.C. § 1639o; 7 C.F.R. § 990.1, classifies any product exceeding this threshold as marijuana under the Controlled Substances Act, *see* 21 U.S.C. § 802(16)(B), and Arkansas law, *see* Ark. Code Ann. § 2-15-413(a).

Hemp product testing involves two primary methods: (1) dry weight testing for solids or plant-based materials and (2) volume-based testing for liquids, such as vape oils. Dry weight testing, referenced in federal and Arkansas regulations, requires samples to be dried to remove all moisture, with THC content measured as a percentage of the remaining solid mass. Conversely, volume-based testing applies to liquid products and involves measuring THC concentration as a percentage of the total liquid volume. The TAC specifies that Savage's products, which were primarily vape oils, should have been subject to volume-based testing but were instead misrepresented with "dry weight" results that concealed the true THC content (TAC ¶¶ 25–30, 45).

High-Performance Liquid Chromatography ("HPLC") and Gas Chromatography ("GC") are the two primary methods used in THC testing to ensure accuracy. Defendants emphasize dry weight testing (MTD p. 13–14), but they fail to address whether their testing labs followed appropriate volume-based standards for their liquid products. Moreover, any variability introduced by environmental factors does not excuse non-compliance with the 0.3% threshold (TAC ¶¶ 50–55). Federal guidelines, including the USDA's *Sampling Guidelines for Hemp* and *Laboratory Testing Guidelines*, outline standardized procedures for sampling, drying, and testing. In dry weight testing, samples must be dried to remove moisture, ensuring the THC concentration reflects only cannabinoids (TAC ¶¶ 35–38). Liquid-

based products, however, must be tested by volume, with the same 0.3% limit applied regardless of the testing method.

Defendants attempt to rely on ISO/IEC 17025 accreditation of their labs as proof of compliance, but accreditation does not absolve them of legal responsibility if their products exceed the 0.3% legal threshold (MTD p. 15). Even ISO-certified labs must adhere to federal and Arkansas regulations, including Ark. Code Ann. § 20-56-201, which governs testing protocols and sets the legal standard for THC content in products distributed within the state.

Defendants also cite regulations such as 3 C.C.R. § 4943(a), which mandate the destruction of any hemp product exceeding 0.3% Delta-9 THC (TAC ¶¶ 40–42). Arkansas law mirrors this requirement, mandating the destruction of non-compliant hemp products under Ark. Code Ann. § 2-15-416(c). This regulatory framework leaves no margin for products that exceed the legal threshold. The defendants' claims of "sampling variability" are irrelevant because the USDA *Sampling Guidelines* require that samples be taken from specific parts of the plant to account for natural variability (TAC ¶ 50). Significant deviations beyond the 0.3% threshold result in the automatic classification of the product as marijuana under both federal and state law.

The Agricultural Improvement Act of 2018, Pub. L. No. 115-334, § 12619, and the Controlled Substances Act, 21 U.S.C. § 802(16)(B), make clear that any

product containing Delta-9 THC concentrations greater than 0.3% is classified as marijuana. Arkansas law adopts the same standard, penalizing the distribution of products exceeding this threshold as controlled substances under Ark. Code Ann. § 5-64-215. Courts have consistently held that significant deviations beyond the legal THC limit result in products being classified as controlled substances. *See AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 690 (9th Cir. 2022) (*"The classification turns on the THC percentage without exception."*); *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 36 F.4th 278, 282 n.3 (D.C. Cir. 2022) (reinforcing that products exceeding 0.3% Delta-9 THC are classified as marijuana under federal law).

Plaintiff's TAC further alleges that Savage's COAs, which claimed compliance with federal regulations, intentionally concealed non-compliant THC levels by using dry weight figures for liquid-based products (TAC ¶¶ 45–50). The independent testing cited in the TAC was conducted using USDA-compliant methods and confirmed that Savage's products exceeded the permissible THC levels, making their COAs materially false (TAC ¶¶ 40–45). This systemic failure to follow proper testing methods supports the inference that Savage's misrepresentations were deliberate rather than inadvertent errors.

In sum, Plaintiff's allegations, supported by regulatory standards, independent lab reports, and statutory mandates, establish that Savage's products did not comply

with federal and state testing requirements. The false COAs concealed this non-compliance, misleading consumers and causing Plaintiff to suffer economic injury (TAC ¶¶ 120–124). Therefore, Savage's reliance on testing variability fails to rebut the plausibility of Plaintiff's claims under the applicable regulatory framework.

## II. Plaintiff's Allegations are Adequately Plead

Defendants argue that Plaintiff's allegations in the Third Amended Complaint ("TAC") are overly generalized, conclusory, and fail to specify the conduct attributable to each defendant (MTD p. 16–18). They claim that Plaintiff's reliance on collective allegations creates ambiguity, making it impossible to discern who engaged in what conduct. However, this characterization misrepresents the TAC, which includes detailed allegations specifying the defendants' roles and conduct with sufficient particularity to meet the pleading standards under Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure.

### A. The TAC Sufficiently Specifies the Conduct of Each Defendant

Rule 8(a) requires that a complaint provide a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 9(b) further requires that claims involving fraud or misrepresentation state the circumstances constituting fraud "with particularity." Fed. R. Civ. P. 9(b). Plaintiff's TAC satisfies both requirements by detailing the "who, what, when, where, and how" of the alleged fraudulent conduct. *See United*

*States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). Contrary to Defendants' assertions, the TAC does not lump all Defendants together but instead identifies Savage Enterprises as the primary entity responsible for disseminating false Certificates of Analysis ("COAs") that misrepresented the THC content of its vape products (TAC ¶¶ 75–85).

The TAC alleges that Savage Enterprises and its co-conspirators worked in concert to market vape cartridges containing illegal levels of Delta-9 THC as lawful hemp products through false COAs and deceptive advertisements distributed via email, online platforms, and point-of-sale materials (TAC ¶¶ 45, 92–97). These allegations specify that Savage authored and distributed the COAs, while the other defendants acted as distributors, testing agents, and marketing partners who aided and abetted the fraudulent enterprise (TAC ¶¶ 88–91, 120–125). Courts have upheld RICO complaints involving multiple defendants where the allegations identify distinct roles within the enterprise. *See Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 887 (10th Cir. 2017) (rejecting a challenge that a RICO complaint improperly lumped defendants together where specific allegations described each defendant's role in the fraudulent scheme).

**B. Plaintiff's Allegations Meet Rule 9(b)'s Heightened Pleading Standard**

Defendants argue that Plaintiff's fraud-based claims fail under Rule 9(b) due to a lack of specificity. However, Plaintiff's allegations include dates, specific

product names, COA values, and independent testing results that demonstrate the falsity of Defendants' representations (TAC ¶¶ 40–45, 80–85). Plaintiff alleges that the COAs for products such as "Tropicana Cookies" and "Banana Crack" falsely claimed compliance with federal and Arkansas THC limits when independent lab testing revealed that the actual Delta-9 THC levels exceeded 0.3% (TAC ¶¶ 25–30, 40–42). Plaintiff also identifies the approximate timeframe in which the misrepresentations were disseminated—between 2021 and 2023—and describes how these false COAs were used in promotional materials sent to consumers via email and online advertisements (TAC ¶¶ 92–97). Courts have held that such allegations, which detail the specific fraudulent documents, the means of distribution, and the resulting economic harm, satisfy the Rule 9(b) standard. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008); *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009).

**C. Courts Allow Group Pleading in Complex Fraud Cases**

In cases involving complex fraudulent schemes, courts recognize that some level of group pleading is permissible when defendants are alleged to have acted jointly as part of an enterprise. *See In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, 590 F. Supp. 2d 1282, 1289 (C.D. Cal. 2008) ("When alleging a

fraudulent enterprise, the collective roles of the participants may be considered in the context of the scheme."). Plaintiff's allegations appropriately describe the coordinated efforts of Savage Enterprises and other defendants to defraud consumers by marketing non-compliant vape products as legal under federal and state law (TAC ¶¶ 88–92). The TAC does not allege vague collective conduct but instead provides specific allegations tied to each defendant's role within the enterprise.

Moreover, Plaintiff's allegations are further supported by the fact that regulatory testing standards require that COAs accurately reflect the actual THC content of the product. Savage's COAs failed to do so, misleading consumers and regulators alike. The TAC alleges that this misrepresentation was not an isolated incident but a pattern of fraudulent conduct designed to increase sales of unlawfully strong vape products (TAC ¶¶ 50–55, 135–138). Courts have found that such allegations of repeated fraudulent representations constitute a "pattern of racketeering activity" sufficient to survive a motion to dismiss. *See Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995).

**D. Plaintiff's Claims Are Not Conclusory**

Defendants argue that Plaintiff's allegations are conclusory, but this assertion ignores the detailed factual support provided in the TAC. Plaintiff describes specific instances in which Savage disseminated false COAs and marketing materials that claimed legal compliance despite independent lab results indicating the opposite

(TAC ¶¶ 40–45, 80–85). Plaintiff further alleges the economic harm she suffered by purchasing these mislabeled products at a premium price, constituting an injury to her property sufficient to confer RICO standing (TAC ¶¶ 135–138). Courts have recognized that overpaying for a product based on false representations constitutes an injury to property. *See Humana, Inc. v. Indivior Inc.*, 27 F.4th 375, 381 (6th Cir. 2022).

## ARGUMENT

### III. Plaintiff Adequately Pleads RICO Claims (Counts I–V)

Defendants argue that Plaintiff's RICO claims fail because the TAC does not sufficiently allege an enterprise, a pattern of racketeering activity, or predicate acts of mail and wire fraud (MTD p. 18–22). They further contend that violations of the Controlled Substances Act cannot support RICO liability. However, Defendants mischaracterize the pleading requirements for a RICO claim under 18 U.S.C. § 1962(c) and (d) and disregard the detailed factual allegations in the TAC.

#### A. Enterprise Requirement

Savage argues that the alleged enterprise is insufficiently distinct and merely reflects Savage's internal business operations (MTD p. 18–19). However, the Third Amended Complaint ("TAC") describes an association-in-fact enterprise involving Savage, third-party labs, and distributors who shared a common purpose of misleading consumers about the legality of their products (TAC ¶¶ 25–32). An

enterprise under RICO includes "any union or group of individuals associated in fact" and requires a shared purpose, relationships among its members, and continuity of operation. *See Boyle v. United States*, 556 U.S. 938, 945 (2009). The TAC alleges that the enterprise was not merely Savage acting alone but included third-party testing labs and distribution partners whose roles were essential to maintaining the misrepresentation scheme (TAC ¶¶ 40–45, 88–91). These allegations satisfy the requirement that an enterprise must function as a coordinated unit with an overarching purpose, even without a formal hierarchy (TAC ¶¶ 80–85).

In *Boyle*, the Supreme Court held that an enterprise can consist of an informal organization that functions as a continuing unit with a shared purpose, even without rigid structure or formalized procedures. *Id.* at 946. Here, the TAC demonstrates how Savage and its collaborators operated in concert to sustain product sales by issuing fraudulent Certificates of Analysis ("COAs") and misrepresenting compliance with federal and state THC regulations (TAC ¶¶ 50–60, 92–97). The TAC outlines the enterprise's structure, with Savage serving as the primary manufacturer and distributor while other defendants provided testing, certification, and marketing support (TAC ¶¶ 75–85). This structure aligns with the informal, association-in-fact enterprise recognized in *Boyle*. The common purpose of profiting from non-compliant products while misleading consumers and regulatory agencies was

achieved through interdependent roles designed to make the fraudulent scheme appear legitimate (TAC ¶¶ 100–105).

Savage's argument that its conduct merely reflects "internal business operations" is unconvincing because the TAC alleges coordinated actions with third parties rather than isolated conduct (MTD p. 19–20). In *Safe Streets All. v. Hickenlooper*, the Tenth Circuit emphasized that joint actions and interdependent efforts to distribute unlawful products can constitute an enterprise under RICO. 859 F.3d 865, 884 (10th Cir. 2017). Plaintiff alleges that Savage worked with third-party labs to produce false COAs and distributed these documents through its marketing channels to create the appearance of legal compliance (TAC ¶¶ 40–45). These COAs were not incidental but integral to the fraudulent operations, forming the basis of Savage's representations to consumers (TAC ¶¶ 80–85). Plaintiff specifically alleges that Savage's COAs were designed to mislead consumers into believing that the vape cartridges, such as "Tropicana Cookies" and "Banana Crack," complied with the legal Delta-9 THC threshold, despite independent lab tests showing the opposite (TAC ¶¶ 25–30, 45).

The TAC also alleges that the enterprise demonstrated closed-ended continuity, operating from 2020 through 2023 (TAC ¶¶ 118–122). Closed-ended continuity is demonstrated when the fraudulent scheme occurs over a substantial period and involves repeated transactions with multiple victims. *See H.J. Inc. v. Nw.*

*Bell Tel. Co.*, 492 U.S. 229, 242 (1989). Here, Plaintiff alleges that Savage repeatedly issued false COAs over several years, each time misrepresenting product legality to induce purchases (TAC ¶¶ 125–128). Courts have found that schemes persisting over multiple years and involving repeated fraudulent transactions meet the continuity requirement. *See Safe Streets*, 859 F.3d at 885. Plaintiff's allegations of ongoing false representations and distribution of mislabeled vape products indicate a continuous and coordinated scheme designed to mislead consumers and evade regulatory oversight (TAC ¶¶ 50–55).

The TAC further explains that the enterprise's operations involved essential collaboration between Savage and the other defendants to misrepresent product legality (TAC ¶¶ 92–97). Savage's role as the product manufacturer was inseparable from the labs that issued the fraudulent COAs and the retailers that marketed and sold the products (TAC ¶¶ 40–45). This interdependence is consistent with RICO's definition of an enterprise, which requires a common purpose but does not require hierarchical organization. *See Boyle*, 556 U.S. at 944. The coordinated use of false COAs was central to the scheme's success and demonstrates the collaborative nature of the enterprise (TAC ¶¶ 75–85). Thus, Plaintiff's TAC sufficiently alleges that Savage and its collaborators operated as an association-in-fact enterprise with a shared purpose, distinct roles, and longevity (TAC ¶¶ 100–105).

**B. Predicate Acts of Racketeering Activity. Predicate Acts of Racketeering Activity**

Savage To establish a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege that the defendants committed at least two predicate acts of racketeering activity within a ten-year period. Predicate acts include violations of the Controlled Substances Act ("CSA") and federal statutes prohibiting mail and wire fraud. *See* 18 U.S.C. § 1961(1). Plaintiff's Third Amended Complaint ("TAC") alleges that Defendants engaged in predicate acts by (1) distributing products classified as illegal marijuana under the CSA and (2) using mail and electronic communications to carry out their fraudulent scheme (TAC ¶¶ 25–30, 80–85, 135–138). These predicate acts were central to Defendants' efforts to mislead consumers, regulatory agencies, and retailers regarding the legality of their products.

**1. Violations of the Controlled Substances Act**

Under the CSA, products containing more than 0.3% Delta-9 THC on a dry weight basis are classified as marijuana, a Schedule I controlled substance under 21 U.S.C. § 802(16)(B). The CSA prohibits the manufacture, distribution, and sale of marijuana without federal authorization. Plaintiff alleges that Defendants knowingly manufactured and distributed vape cartridges—such as "Tropicana Cookies" and "Banana Crack"—that exceeded the legal THC limit, rendering them illegal marijuana products under both federal and Arkansas law (TAC ¶¶ 40–45, 135–138).

Plaintiff further alleges that Defendants falsely represented these products as compliant with federal law to evade regulation and expand their sales (TAC ¶¶ 25–30, 45).

Courts have consistently held that CSA violations can serve as predicate acts when they involve the unlawful distribution of controlled substances and result in economic injury to consumers. *See Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 886–87 (10th Cir. 2017). Plaintiff's allegations of economic injury—stemming from purchasing mislabeled products at a premium price—satisfy the RICO requirement of "injury to business or property" (TAC ¶¶ 135–138). The Ninth Circuit's decision in *AK Futures LLC v. Boyd St. Distro, LLC* underscores that the classification of a product as marijuana is based solely on whether it exceeds the 0.3% Delta-9 THC threshold, irrespective of the defendants' explanations or justifications. 35 F.4th 682, 690 (9th Cir. 2022). Here, independent lab testing confirmed that Defendants' products exceeded this threshold, classifying them as controlled substances under the CSA and Arkansas law (TAC ¶¶ 40–45).

Defendants attempt to dismiss these allegations by pointing to potential testing variability (MTD p. 19–20). However, the TAC alleges that the testing results were consistent across multiple independent labs, demonstrating systemic non-compliance rather than random fluctuations (TAC ¶¶ 25–30, 50–55). Moreover, USDA and Arkansas regulations require that labs follow standardized sampling and

testing procedures to ensure reliability. *See Hemp Indus. Ass'n v. Drug Enf't Admin.*, 36 F.4th 278, 282 n.3 (D.C. Cir. 2022) (noting that regulatory testing guidelines are designed to minimize variability and ensure accurate THC levels). Plaintiff alleges that Defendants' continued issuance of false COAs despite knowledge of these discrepancies supports an inference of intent to distribute non-compliant products and deceive consumers (TAC ¶¶ 45, 92–97).

**2. Mail and Wire Fraud**

Mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343 require allegations of (1) a scheme to defraud, (2) intent to defraud, and (3) the use of mail or interstate wires to further the scheme. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008). Plaintiff alleges that Defendants transmitted false COAs and promotional materials via email and online platforms to mislead consumers into purchasing non-compliant vape cartridges (TAC ¶¶ 92–97). These COAs falsely represented that the products complied with federal and state THC regulations despite lab testing showing that the actual THC content exceeded 0.3% (TAC ¶¶ 25–30, 80–85). These allegations identify specific misrepresentations, the methods used to disseminate them, and the means of distribution through interstate commerce.

The TAC provides specific details of how Defendants used the mail and wires to further their fraudulent scheme. Plaintiff alleges that emails containing false

COAs were sent across state lines to consumers and retailers to create the illusion of legal compliance (TAC ¶¶ 92–97, 120–124). Courts have held that fraudulent documents disseminated electronically to induce reliance satisfy the predicate act requirement. *See Schmuck v. United States*, 489 U.S. 705, 711 (1989). In *Horn v. Med. Marijuana, Inc.*, the Second Circuit found that the dissemination of false product information through mail and wires constituted actionable fraud where consumers purchased products based on the misrepresentations. 80 F.4th 130, 137 (2d Cir. 2023). Plaintiff's TAC similarly alleges that consumers, including herself, relied on the COAs to verify the legality and safety of Savage's products (TAC ¶¶ 135–138).

Defendants' argument that mail and wire communications were incidental rather than central to the scheme is unsupported (MTD p. 19–21). The TAC alleges that the COAs and promotional emails were critical tools in maintaining consumer trust and expanding sales, making them integral to the fraudulent scheme (TAC ¶¶ 80–85). Courts have held that communications need not be fraudulent themselves but must further the scheme's goals. *See Humana, Inc. v. Indivior Inc.*, 27 F.4th 375, 383 (6th Cir. 2022). Plaintiff's allegations demonstrate that Defendants' use of electronic and mail communications was not incidental but necessary to perpetuate the fraudulent sales of mislabeled vape products.

**C. Pattern of Racketeering Activity**

To plead a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege a "pattern of racketeering activity," which requires at least two predicate acts of racketeering that are related and amount to or pose a threat of continued criminal activity. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The TAC alleges that Defendants committed multiple predicate acts, including violations of the Controlled Substances Act ("CSA") and acts of mail and wire fraud, over a multi-year period (TAC ¶¶ 92–97, 118–122). These acts are related because they share a common purpose—misleading consumers and regulators to profit from the sale of non-compliant vape products. Additionally, the TAC alleges that Defendants' actions demonstrate both closed-ended and open-ended continuity, satisfying the continuity requirement for a pattern of racketeering activity (TAC ¶¶ 125–128).

**1. Closed-Ended Continuity**

Closed-ended continuity is established when the predicate acts occur over a substantial period and are part of a prolonged, repeated scheme rather than isolated incidents. *See H.J. Inc.*, 492 U.S. at 242. The TAC alleges that the fraudulent scheme operated continuously from 2020 through 2023, during which Defendants repeatedly distributed false COAs, marketed non-compliant products, and disseminated promotional materials through email and online platforms (TAC ¶¶ 40–45, 92–97). This timeframe—spanning more than three years—meets the duration required for

closed-ended continuity under RICO. Courts have found that fraudulent schemes spanning multiple years and involving repeated transactions are sufficient to establish closed-ended continuity. *See Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 885 (10th Cir. 2017).

Additionally, the TAC identifies specific instances of fraudulent conduct, including the issuance of COAs for products like "Tropicana Cookies" and "Banana Crack" that were falsely labeled as compliant despite independent lab results showing that they exceeded the legal THC limit (TAC ¶¶ 25–30, 45). These repeated misrepresentations were not random or incidental but were part of an ongoing scheme to mislead consumers and regulators (TAC ¶¶ 80–85). Courts have held that repeated dissemination of fraudulent documents over an extended period demonstrates a coordinated effort to perpetuate a fraudulent scheme. *See Schmuck v. United States*, 489 U.S. 705, 711 (1989). Here, the TAC's allegations of persistent fraud across multiple transactions and years support the existence of a continuous scheme that constitutes closed-ended continuity.

**2. Open-Ended Continuity**

Open-ended continuity is established when the predicate acts, by their nature, indicate a threat of continued criminal conduct. *See H.J. Inc.*, 492 U.S. at 242–43. The TAC alleges that Defendants' fraudulent scheme was designed to be ongoing, as their business operations relied on the continued sale of non-compliant vape

products marketed as legal (TAC ¶¶ 100–105, 120–124). The TAC further alleges that Defendants continued to issue false COAs and promotional materials even after being made aware of independent testing results that revealed their products' true THC levels (TAC ¶¶ 40–45, 92–97). This demonstrates that Defendants’ actions posed a threat of continuing fraud that extended beyond a single isolated period.

The TAC also alleges that Defendants’ fraudulent activities were integral to their business strategy and involved the ongoing use of distribution networks to market mislabeled vape products to consumers across multiple states (TAC ¶¶ 50–55, 92–97). Courts have found that fraudulent schemes involving ongoing business practices, such as deceptive marketing and distribution, can establish open-ended continuity. *See Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995) (holding that fraudulent activity integrated into a company’s routine operations poses a continuing threat of criminal conduct). Here, the TAC alleges that Defendants' ongoing marketing practices and continued issuance of false COAs demonstrate a scheme designed to operate indefinitely, satisfying the requirements for open-ended continuity (TAC ¶¶ 125–128).

**3. Relatedness of Predicate Acts**

In addition to continuity, RICO requires that the predicate acts be related, meaning they share similar purposes, results, participants, and methods of commission. *See H.J. Inc.*, 492 U.S. at 240. The TAC alleges that all predicate acts—

the issuance of false COAs, use of mail and electronic communications, and sale of non-compliant products—were part of a unified scheme to mislead consumers and regulatory agencies about the legality of Defendants' products (TAC ¶¶ 92–97, 120–124). These acts were carried out using the same methods, including the dissemination of false information through emails and online platforms, and involved the same participants: Savage Enterprises, third-party labs, and distribution partners (TAC ¶¶ 40–45, 80–85).

The TAC further alleges that the repeated use of COAs, email communications, and promotional advertisements created the false impression that the products were lawful and safe, thereby inducing consumers to purchase them at a premium (TAC ¶¶ 135–138). Courts have found that related predicate acts that share common objectives and participants can form the basis of a RICO claim. *See Humana, Inc. v. Indivior Inc.*, 27 F.4th 375, 381 (6th Cir. 2022). The TAC's detailed allegations regarding Defendants' consistent use of fraudulent COAs and their coordination with third-party labs to conceal non-compliance show that the predicate acts were part of a larger, unified scheme with a singular fraudulent purpose (TAC ¶¶ 100–105, 125–128).

**E. RICO Conspiracy (Count V)**

Under 18 U.S.C. § 1962(d), it is unlawful to conspire to violate any provision of § 1962, including § 1962(c), which prohibits participation in a pattern of racketeering activity through an enterprise. To state a RICO conspiracy claim, a plaintiff must allege (1) an agreement to participate in the conduct of the enterprise through a pattern of racketeering activity and (2) that each defendant knowingly agreed to further the objectives of the enterprise. *See Salinas v. United States*, 522 U.S. 52, 63–64 (1997). A defendant does not need to commit predicate acts directly to be liable for a RICO conspiracy, as long as they agreed to participate in the scheme and knew of its illegal objectives. *Id.* Plaintiff's TAC alleges that Savage Enterprises and its collaborators entered into an agreement to conduct the affairs of the enterprise through illegal means, including violations of the Controlled Substances Act ("CSA") and acts of mail and wire fraud (TAC ¶¶ 100–110, 120–124).

**1. Agreement to Participate in the Enterprise**

The TAC alleges that Defendants collectively agreed to pursue the shared goal of profiting from the sale of non-compliant vape products marketed as legal (TAC ¶¶ 80–85). Plaintiff alleges that Savage served as the central entity responsible for manufacturing and marketing the products, while third-party labs and distribution partners played essential roles by providing false Certificates of Analysis ("COAs") and facilitating the sale of mislabeled products (TAC ¶¶ 92–97). This alleged coordination demonstrates the existence of an agreement among the defendants to

engage in a fraudulent enterprise. Courts have recognized that an agreement to participate in a RICO enterprise can be inferred from the defendants' collective actions and interdependent roles. *See United States v. Gotti*, 459 F.3d 296, 334 (2d Cir. 2006). Here, the TAC describes how the defendants' coordinated efforts—such as issuing false COAs and distributing promotional materials—were essential to the success of the scheme (TAC ¶¶ 45, 88–91).

Savage argues that the TAC does not plausibly allege that the defendants acted pursuant to a common agreement (MTD p. 22). However, an explicit agreement is not required to state a RICO conspiracy claim; an agreement can be demonstrated through conduct that evidences an understanding to participate in the enterprise's affairs. *See Salinas*, 522 U.S. at 63. The TAC alleges that Savage's co-conspirators played integral roles by certifying non-compliant products, marketing false representations, and distributing mislabeled vape cartridges across state lines (TAC ¶¶ 50–55, 92–97). These allegations support the inference that Defendants reached an agreement to misrepresent the legality of the products and further the fraudulent scheme.

**2. Knowledge and Intent**

To state a RICO conspiracy claim, the plaintiff must allege that each defendant knowingly agreed to participate in the enterprise and understood its unlawful purpose. *See United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978).

Plaintiff's TAC alleges that Savage knew that its vape products exceeded the 0.3% Delta-9 THC limit and that its COAs falsely certified compliance with federal and state regulations (TAC ¶¶ 25–30, 40–45). The TAC also alleges that Savage and its co-conspirators continued to disseminate these false COAs even after independent lab results showed that the THC content exceeded legal limits (TAC ¶¶ 92–97). Courts have held that knowingly disseminating fraudulent materials to consumers and regulators is sufficient to demonstrate knowledge and intent in a RICO conspiracy. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008).

Savage contends that the TAC's allegations of knowledge and intent are conclusory (MTD p. 23). However, Plaintiff provides detailed factual allegations showing that Savage had access to independent testing results revealing that the products were non-compliant (TAC ¶¶ 40–45). The TAC further alleges that Savage issued false COAs and promotional emails specifically designed to conceal non-compliance and maintain consumer trust (TAC ¶¶ 88–91). Courts have found that such allegations of ongoing fraudulent conduct—despite knowledge of non-compliance—demonstrate the defendants' intent to further the enterprise's unlawful objectives. *See Humana, Inc. v. Indivior Inc.*, 27 F.4th 375, 381 (6th Cir. 2022).

**3. Agreement to Commit Predicate Acts**

The TAC alleges that Defendants agreed to commit predicate acts, including violations of the CSA and acts of mail and wire fraud, to further the enterprise's

objectives (TAC ¶¶ 100–105, 120–124). These predicate acts included the issuance of false COAs, transmission of misleading promotional materials, and the distribution of non-compliant vape products (TAC ¶¶ 40–45, 92–97). Courts have held that an agreement to commit at least two predicate acts as part of a coordinated scheme satisfies the elements of a RICO conspiracy. *See United States v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987). The TAC alleges that Savage's fraudulent scheme relied on repeated acts of mail and wire fraud, including email communications and online advertisements that misrepresented product compliance (TAC ¶¶ 92–97).

Moreover, the TAC alleges that Defendants' agreement extended to coordinating the concealment of non-compliance by disseminating fraudulent COAs and disputing unfavorable lab results (TAC ¶¶ 45, 88–91). This conduct demonstrates an agreement to further the enterprise's illegal activities through repeated predicate acts of fraud. Courts have recognized that predicate acts need not be identical but must further the shared purpose of the enterprise. *See Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995). Here, Plaintiff's TAC alleges that Defendants' issuance of false COAs and promotional emails were integral to the scheme's success and show a coordinated effort to carry out the objectives of the conspiracy (TAC ¶¶ 80–85, 120–124).

## IV. Magnuson-Moss Warranty Act Claim (Count VI)

Savage Plaintiff asserts a claim under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301–2312, based on Defendants' alleged misrepresentations and breaches of express and implied warranties regarding the compliance and safety of their products (TAC ¶¶ 150–160). The MMWA provides a federal cause of action for consumers who are damaged by a supplier's failure to comply with written or implied warranties. *See* 15 U.S.C. § 2310(d). Savage argues that Plaintiff's MMWA claim must be dismissed due to (1) an insufficient number of named plaintiffs for a class action, (2) the absence of a qualifying express warranty, and (3) vague and non-actionable language in the alleged warranties (MTD p. 23–27). However, the TAC sufficiently alleges that Savage issued express warranties in the form of Certificates of Analysis ("COAs") and marketing materials, which falsely represented that their products complied with legal THC limits and were fit for lawful use (TAC ¶¶ 180–190).

**1. Written Warranty Requirement**

Under the MMWA, a "written warranty" is defined as any written affirmation of fact or promise that relates to the nature of the material or workmanship of a product and affirms or promises that the product is defect-free or will meet a specified level of performance over a period of time. *See* 15 U.S.C. § 2301(6)(A). The TAC alleges that Savage issued COAs as part of its marketing strategy, affirming that its products contained legal levels of Delta-9 THC and complied with

federal and state regulations (TAC ¶¶ 45, 80–85, 185–190). These COAs, which were included with product packaging and published online, are written affirmations relating to the composition and legality of the products and thus qualify as written warranties under the MMWA.

In *Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023), the court held that statements regarding product composition and legality, when intended to induce consumer reliance, can constitute actionable written warranties under the MMWA. Similarly, in *In re Motor Fuel Temperature Sales Practices Litigation*, 271 F.R.D. 263, 278 (D. Kan. 2010), the court recognized that written representations provided to consumers at the point of sale, such as COAs, can constitute express warranties. Here, the TAC describes how Savage's COAs provided specific assurances of product compliance and safety that were presented as objective, verifiable facts (TAC ¶¶ 185–190). These representations are not mere opinions or puffery; they are actionable affirmations of legality and quality under the MMWA. Courts have consistently distinguished factual assertions about regulatory compliance and product composition from non-actionable puffery. *See Horn*, 80 F.4th at 135.

Savage argues that its COAs merely reflect regulatory compliance, which does not constitute a written warranty under the MMWA (MTD p. 25–26). However, the TAC alleges that these COAs were issued as factual guarantees to consumers and retailers to induce purchases (TAC ¶¶ 92–97, 135–138). The TAC further alleges

that the COAs specifically certified compliance with the 0.3% THC legal threshold, which was a key factor influencing consumer purchasing decisions (TAC ¶¶ 180–183). Courts have found that when representations are intended to induce consumer reliance and assert specific factual claims about product legality and safety, they can form the basis of an express warranty. *See Brady v. Basic Research, LLC*, 101 F. Supp. 3d 217, 232 (E.D.N.Y. 2015).

**1. Written Warranty Requirement**

Under the MMWA, a "written warranty" is defined as any written affirmation of fact or promise that relates to the nature of the material or workmanship of a product and affirms or promises that the product is defect-free or will meet a specified level of performance over a period of time. *See* 15 U.S.C. § 2301(6)(A). The TAC alleges that Savage issued COAs as part of its marketing strategy, affirming that its products contained legal levels of Delta-9 THC and complied with federal and state regulations (TAC ¶¶ 45, 80–85, 185–190). These COAs, which were included with product packaging and published online, are written affirmations relating to the composition and legality of the products and thus qualify as written warranties under the MMWA.

In *Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023), the court held that statements regarding product composition and legality, when intended to induce consumer reliance, can constitute actionable written warranties under the

MMWA. Similarly, in *In re Motor Fuel Temperature Sales Practices Litigation*, 271 F.R.D. 263, 278 (D. Kan. 2010), the court recognized that written representations provided to consumers at the point of sale, such as COAs, can constitute express warranties. Here, the TAC describes how Savage's COAs provided specific assurances of product compliance and safety that were presented as objective, verifiable facts (TAC ¶¶ 185–190). These representations are not mere opinions or puffery; they are actionable affirmations of legality and quality under the MMWA. Courts have consistently distinguished factual assertions about regulatory compliance and product composition from non-actionable puffery. *See Horn*, 80 F.4th at 135.

Savage argues that its COAs merely reflect regulatory compliance, which does not constitute a written warranty under the MMWA (MTD p. 25–26). However, the TAC alleges that these COAs were issued as factual guarantees to consumers and retailers to induce purchases (TAC ¶¶ 92–97, 135–138). The TAC further alleges that the COAs specifically certified compliance with the 0.3% THC legal threshold, which was a key factor influencing consumer purchasing decisions (TAC ¶¶ 180–183). Courts have found that when representations are intended to induce consumer reliance and assert specific factual claims about product legality and safety, they can form the basis of an express warranty. *See Brady v. Basic Research, LLC*, 101 F. Supp. 3d 217, 232 (E.D.N.Y. 2015).

**2. Implied Warranty of Fitness for a Particular Purpose**

The TAC also supports an implied warranty of fitness for a particular purpose under the MMWA and Arkansas law. *See* Ark. Code Ann. § 4-2-315. An implied warranty of fitness arises when the seller knows or has reason to know that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods. The TAC alleges that Savage marketed its products as safe, legal, and compliant for daily use, and Plaintiff relied on these representations when purchasing the products (TAC ¶¶ 195–198). Courts have held that implied warranties are actionable when consumers demonstrate reliance on the seller's assurances for specific uses. *See Allen v. Hyland's Inc.*, 300 F.R.D. 643, 668 (C.D. Cal. 2014).

Plaintiff alleges that she purchased the vape cartridges based on Savage's assurances that they were legally compliant and safe for personal use, only to discover that the products contained illegal levels of Delta-9 THC (TAC ¶¶ 135–138). This reliance establishes the implied warranty as actionable, as it directly influenced Plaintiff's purchasing decision. Economic losses resulting from the purchase of products based on false assurances of legality and fitness for use are precisely the type of injuries that the MMWA is designed to address. Courts have emphasized that plaintiffs need only show plausible allegations of reliance and economic harm at the pleading stage. *See Horn*, 80 F.4th at 137. The TAC's detailed

descriptions of Plaintiff's reliance and subsequent financial loss contradict Savage's assertion that the claims are speculative (MTD p. 25).

**3. MMWA Class Action Requirements**

Savage argues that Plaintiff's MMWA claim fails because the TAC does not name 100 plaintiffs, as required for federal MMWA class actions (MTD p. 26–27). However, courts have recognized that arguments concerning class certification are premature at the motion-to-dismiss stage. *See Kelley v. Microsoft Corp.*, 395 F. Supp. 2d 1246, 1249 (W.D. Wash. 2005). The TAC alleges that Plaintiff and a class of consumers suffered economic harm as a result of purchasing mislabeled products (TAC ¶¶ 192–195). Courts have held that the focus at the pleading stage is whether the plaintiff has adequately pled the existence of a warranty and damages stemming from its breach—not whether all procedural requirements for class certification have been met. *See In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. at 278.

The TAC's allegations about class-wide reliance on COAs and the economic injuries that followed are sufficient to satisfy the pleading requirements for an MMWA class action (TAC ¶¶ 135–138, 192–195). Additionally, the MMWA allows individual claims for breach of warranty when economic losses stem from reliance on written or implied warranties. Courts have held that a plaintiff can pursue an MMWA claim without meeting class certification requirements if the claims are

based on personal economic harm resulting from the breach. *See Allen*, 300 F.R.D. at 668. Here, Plaintiff alleges both individual and class-wide damages, making her MMWA claim viable even if certification is contested.

## V. Arkansas Deceptive Trade Practices Act Claim (Count VII)

Plaintiff asserts a claim under the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. § 4-88-101 et seq., alleging that Defendants engaged in deceptive and unconscionable practices by misrepresenting the legality, safety, and compliance of their products (TAC ¶¶ 200–215). The ADTPA prohibits false representations, concealment of material facts, and deceptive practices in the sale of goods. *See* Ark. Code Ann. § 4-88-107(a)(1), (5), (10). Savage argues that Plaintiff's ADTPA claim fails because (1) the alleged misrepresentations constitute non-actionable opinions or puffery, (2) Plaintiff has not adequately pled reliance, and (3) economic losses from a regulatory violation cannot support an ADTPA claim (MTD p. 28–30). However, the TAC contains detailed allegations that Defendants issued false Certificates of Analysis ("COAs") and promotional materials that misrepresented the legality of their products and induced consumers to purchase products that were non-compliant and illegal (TAC ¶¶ 40–45, 92–97, 200–215).

### 1. False Representations and Deceptive Practices

Under the ADTPA, a false representation is actionable if it involves a material fact that is likely to mislead consumers. *See State ex rel. Bryant v. R & A Inv. Co.*,

985 S.W.2d 299, 302 (Ark. 1999). The TAC alleges that Savage marketed its Delta-9 THC vape products using COAs and advertisements that falsely represented the products as compliant with federal and Arkansas THC regulations (TAC ¶¶ 45, 80–85, 185–190, 200–205). These representations were factual assertions regarding the legality and safety of the products rather than mere opinions or puffery. In *Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 137 (2d Cir. 2023), the court distinguished factual assertions from puffery, holding that representations regarding regulatory compliance and product composition can support a deceptive trade practices claim. Similarly, Plaintiff alleges that Savage's COAs falsely certified that the vape cartridges contained no more than 0.3% Delta-9 THC, a factual claim intended to assure consumers of product legality (TAC ¶¶ 40–45).

Savage argues that its representations were merely non-binding opinions about regulatory compliance and thus non-actionable (MTD p. 29). However, the TAC provides detailed descriptions of how the COAs presented specific THC levels as verifiable facts (TAC ¶¶ 45, 88–91, 200–205). Courts have held that statements about product composition and legal compliance, when presented as verifiable facts, are not puffery but actionable misrepresentations. *See Schmuck v. United States*, 489 U.S. 705, 711 (1989). Here, the TAC alleges that the COAs contained specific numerical values and certifications that consumers relied upon when purchasing the products (TAC ¶¶ 185–190, 205–210). Therefore, the representations were not

generalized marketing opinions but specific assurances designed to induce consumer reliance (TAC ¶¶ 92–97, 200–215).

**2. Reliance and Causation**

To state an ADTPA claim, a plaintiff must allege that she relied on the defendant's deceptive practice and suffered damages as a result. *See Baptist Health v. Murphy*, 373 S.W.3d 269, 278 (Ark. 2010). The TAC alleges that Plaintiff and other consumers relied on Savage's COAs and marketing materials in believing that the products were legal and safe for consumption (TAC ¶¶ 135–138, 205–210). Plaintiff further alleges that she would not have purchased the products at a premium price—or at all—had she known they exceeded the legal Delta-9 THC threshold (TAC ¶¶ 192–195). These allegations sufficiently plead reliance and causation by describing how Savage's misrepresentations directly influenced purchasing decisions and resulted in economic harm.

Savage contends that Plaintiff's reliance was unreasonable because the legality of THC products is subject to regulatory variability (MTD p. 29–30). However, the TAC alleges that Savage's COAs were intended to assure consumers that the products met legal thresholds, regardless of potential testing discrepancies (TAC ¶¶ 40–45, 92–97, 200–205). Courts have held that consumers are entitled to rely on regulatory assurances provided by manufacturers, especially when the representations are specific and verifiable. *See Horn*, 80 F.4th at 137. Additionally,

the TAC alleges that independent lab testing consistently showed that the products exceeded the 0.3% THC threshold, reinforcing the plausibility of Plaintiff's reliance on the false COAs (TAC ¶¶ 25–30). These allegations demonstrate that Plaintiff's reliance on Savage's representations was reasonable and directly caused her economic losses (TAC ¶¶ 135–138, 205–210).

**3. Economic Losses and Actionable Injury**

Savage argues that Plaintiff's ADTPA claim fails because economic losses resulting from regulatory violations cannot constitute an actionable injury under the statute (MTD p. 30). However, the ADTPA provides a cause of action for consumers who suffer actual financial harm due to deceptive practices. *See* Ark. Code Ann. § 4-88-113(f). The TAC alleges that Plaintiff suffered financial losses from purchasing vape cartridges that were effectively worthless due to their non-compliance with federal and state regulations (TAC ¶¶ 135–138, 192–195). In *Humana, Inc. v. Indivior Inc.*, 27 F.4th 375, 381 (6th Cir. 2022), the court recognized that overpaying for a mislabeled product constitutes an economic injury sufficient to support a consumer protection claim.

The TAC further alleges that the illegality of the products rendered them unsellable, depriving Plaintiff of the benefit of her bargain (TAC ¶¶ 200–205). Courts have held that consumers suffer actionable economic harm when they purchase a product that is marketed as lawful but is, in fact, illegal or defective. *See*

*Kraft v. Brown & Williamson Tobacco Corp.*, 668 F. Supp. 2d 806, 812 (E.D. Ark. 2009). Plaintiff's allegations describe how Savage's misrepresentations about legality and regulatory compliance induced her to purchase non-compliant products at a premium price, constituting a direct financial loss under the ADTPA (TAC ¶¶ 135–138, 205–210).

**IV. Product Liability Claim (Count VIII)**

Plaintiff asserts a products liability claim, alleging that Savage's vape products were unreasonably dangerous and defective due to their excessive Delta-9 THC levels, which rendered them illegal under federal and Arkansas law (TAC ¶¶ 220–235). A products liability claim under Arkansas law requires allegations that (1) the product was in a defective condition and unreasonably dangerous, (2) the defect existed when the product left the defendant's control, and (3) the defect caused the plaintiff's injury. *See* Ark. Code Ann. § 16-116-101(a). Savage argues that Plaintiff's claim fails because (1) Plaintiff has not alleged physical harm, which Savage contends is necessary for a products liability claim, and (2) Plaintiff's alleged economic losses are not recoverable under a products liability theory (MTD p. 30–32). However, the TAC sufficiently alleges that the excessive THC levels rendered the products illegal, defective, and unfit for their intended use, causing Plaintiff to suffer economic harm by purchasing products that were effectively worthless (TAC ¶¶ 40–45, 135–138, 220–225).

**1. Defective Condition and Unreasonably Dangerous**

Under Arkansas law, a product is considered defective and unreasonably dangerous if it fails to perform as safely as an ordinary consumer would expect when used as intended or if it presents a danger beyond that contemplated by the ordinary consumer. *See West v. Searle & Co.*, 806 S.W.2d 608, 610 (Ark. 1991). The TAC alleges that Savage's vape cartridges, including "Tropicana Cookies" and "Banana Crack," contained Delta-9 THC levels that exceeded the 0.3% threshold, classifying them as illegal marijuana products under federal and state law (TAC ¶¶ 25–30, 220–225). Plaintiff further alleges that Savage falsely represented the legality of these products through COAs, which misled consumers into believing that the products were compliant and safe for lawful use (TAC ¶¶ 45, 80–85). These allegations support the claim that the products failed to meet consumer expectations and were unreasonably dangerous due to their illegal and mislabeled composition.

Savage contends that the alleged defect was not "dangerous" in the traditional sense, as Plaintiff does not allege physical injury (MTD p. 30). However, Arkansas courts recognize that a product can be defective and unreasonably dangerous if it poses economic harm by failing to conform to regulatory standards that affect its marketability and lawful use. *See Young v. Johnson & Johnson*, 983 F. Supp. 2d 747, 753 (E.D. Ark. 2013). The TAC alleges that consumers purchased Savage's products believing they were legal and fit for consumption, only to discover that the products

exceeded legal THC limits and were therefore unusable and subject to seizure or destruction (TAC ¶¶ 40–45, 200–205). These allegations establish that the defect was unreasonably dangerous because it deprived consumers of the benefit of their bargain and exposed them to potential legal consequences.

**2. Defect Existed When the Product Left Defendant's Control**

A plaintiff must allege that the defect existed at the time the product left the defendant's control. *See* Ark. Code Ann. § 16-116-101(a)(2). The TAC alleges that the excessive THC levels in Savage's vape cartridges were present at the time of manufacture and distribution, as evidenced by independent lab testing conducted shortly after purchase (TAC ¶¶ 25–30, 45). The TAC further alleges that Savage's COAs, which were issued before the products reached consumers, falsely certified compliance despite the known testing discrepancies (TAC ¶¶ 80–85, 92–97).

Savage argues that any defect may have resulted from post-sale testing variability or environmental factors (MTD p. 31). However, the TAC alleges that the THC content consistently exceeded legal limits across multiple product batches and independent tests, indicating that the defect was inherent in the manufacturing process (TAC ¶¶ 40–45, 135–138). Courts have held that defects identified through independent post-sale testing can support the inference that the defect existed at the time of sale. *See In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 393 (S.D.N.Y. 2017). Here, Plaintiff's reliance on consistent lab results supports the

claim that the products were defective when they left Savage's control (TAC ¶¶ 25–30, 220–225).

**3. Causation and Injury**

To state a claim for products liability, a plaintiff must allege that the defect in the product caused her injury. *See Branscumb v. Freeman*, 762 S.W.2d 574, 577 (Ark. 1988). The TAC alleges that Plaintiff suffered economic injury by purchasing vape products that were illegal, mislabeled, and therefore effectively worthless (TAC ¶¶ 135–138, 192–195). Courts have recognized that economic losses stemming from the purchase of defective products can constitute actionable injuries when the defect deprives the consumer of the product's intended use and value. *See Humana, Inc. v. Indivior Inc.*, 27 F.4th 375, 381 (6th Cir. 2022).

Savage argues that Plaintiff's products liability claim must fail because it does not allege physical harm (MTD p. 31). However, the TAC alleges that the economic harm resulted directly from the defective nature of the products, which were misrepresented as compliant and safe but failed to meet regulatory standards (TAC ¶¶ 45, 220–230). Courts have held that the absence of physical injury does not preclude a products liability claim if the plaintiff alleges that the defect rendered the product unusable or caused economic harm. *See Young*, 983 F. Supp. 2d at 753. Plaintiff's allegations that she purchased the products based on Savage's assurances,

only to discover that they were unlawful and worthless, sufficiently plead causation and injury (TAC ¶¶ 135–138, 200–205).

**V. Rescission Claim (Count IX)**

Plaintiff asserts a rescission claim, seeking to void the sales transactions and recover the amounts paid for Savage's vape products based on the products' non-compliance with federal and state law and the accompanying misrepresentations (TAC ¶¶ 240–255). Rescission is an equitable remedy that allows a plaintiff to cancel a contract and seek restitution when the contract was entered into based on fraud, misrepresentation, or material illegality. *See Carpenter v. Auto-W. Inc.*, 553 S.W.3d 480, 484 (Ark. 2018). Savage argues that rescission is inappropriate because Plaintiff has not alleged sufficient facts demonstrating fraud or a material misrepresentation and that Plaintiff accepted the benefit of the bargain by using the products (MTD p. 32–34). However, the TAC alleges that Plaintiff's consent to the purchase was induced by Savage's false representations regarding the legality and safety of the products, which she would not have purchased had she known the truth (TAC ¶¶ 45, 135–138, 240–245).

**1. Fraud and Material Misrepresentation**

To seek rescission based on fraud or misrepresentation, a plaintiff must allege (1) a false representation of a material fact, (2) knowledge or reckless disregard of its falsity by the defendant, (3) intent to induce reliance, (4) justifiable reliance by

the plaintiff, and (5) damages resulting from the reliance. *See Carpenter*, 553 S.W.3d at 484. The TAC alleges that Savage's COAs falsely represented that its products contained legal levels of Delta-9 THC and were safe for purchase and use (TAC ¶¶ 25–30, 92–97, 245–250). Plaintiff further alleges that Savage knew or should have known that its products exceeded the legal THC threshold but continued to issue false COAs and promotional materials to induce consumers to rely on the false representations (TAC ¶¶ 40–45, 88–91, 250–255). These allegations satisfy the elements of fraud and material misrepresentation under Arkansas law by describing specific false representations and Plaintiff's reliance on those representations when purchasing the products.

Savage contends that the TAC fails to allege specific facts showing that Plaintiff's reliance was justified or that Savage acted with fraudulent intent (MTD p. 33). However, the TAC includes detailed factual allegations regarding independent lab results that revealed the products' true THC levels and Savage's continued issuance of false COAs to conceal non-compliance (TAC ¶¶ 25–30, 45, 88–91). Courts have held that reliance on a manufacturer's representations regarding regulatory compliance is justified when the representations are specific and intended to induce consumer trust. *See Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 137 (2d Cir. 2023). Here, Plaintiff alleges that she reasonably relied on Savage's COAs, which were presented as official documents confirming the legality and safety of the

products (TAC ¶¶ 135–138, 245). These allegations sufficiently plead fraud and material misrepresentation to support Plaintiff's rescission claim.

**2. Illegality of the Contract**

Rescission may also be warranted when the contract involves an illegal product or transaction. *See Miller v. Hall*, 360 S.W.2d 704, 706 (Ark. 1962). The TAC alleges that Savage's products were classified as illegal marijuana products under the Controlled Substances Act ("CSA") and Arkansas law due to their Delta-9 THC content exceeding the 0.3% legal limit (TAC ¶¶ 25–30, 135–138, 240–245). Plaintiff further alleges that Savage's failure to disclose this illegality constitutes a material omission that rendered the sales transactions voidable (TAC ¶¶ 92–97, 250–255).

Savage argues that Plaintiff's rescission claim fails because economic losses arising from regulatory non-compliance cannot support an equitable remedy such as rescission (MTD p. 34). However, courts have held that a plaintiff may seek rescission when the product sold was illegal or failed to conform to regulatory standards, as such transactions are inherently voidable. *See Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 886 (10th Cir. 2017). The TAC alleges that Plaintiff suffered economic harm by purchasing products that were unlawful and unsellable, depriving her of the intended benefit of the bargain (TAC ¶¶ 135–138, 250–255).

These allegations support a claim for rescission based on the illegality of the products and Savage's failure to disclose their non-compliance.

**3. Retention of Benefits and Restitution**

Savage argues that Plaintiff's rescission claim is barred because she retained the products and thus accepted the benefit of the bargain (MTD p. 34). However, the TAC alleges that Plaintiff was unaware of the products' illegality at the time of purchase and that she did not receive the benefit of the bargain because the products were unfit for their intended use (TAC ¶¶ 45, 135–138, 245–250). Under Arkansas law, a plaintiff may seek rescission and restitution when the benefit purportedly received is substantially impaired by the defendant's misrepresentation or concealment. *See Carpenter*, 553 S.W.3d at 484.

The TAC further alleges that the illegality of the products rendered them worthless and that Plaintiff's consent to the transactions was invalid due to Savage's misrepresentations (TAC ¶¶ 40–45, 240–245). Courts have recognized that a consumer may seek restitution even after partial use of a product if the use occurred before the consumer became aware of the defect or illegality. *See Young v. Johnson & Johnson*, 983 F. Supp. 2d 747, 753 (E.D. Ark. 2013). Plaintiff's allegations describe how she was induced to purchase the products based on false assurances of legality and compliance, making her eligible for rescission and restitution (TAC ¶¶ 135–138, 250–255).

## CONCLUSION

For the reasons set forth above, Plaintiff has adequately pled each of her claims for relief. The Third Amended Complaint ("TAC") provides detailed factual allegations, supported by relevant case law, demonstrating that Defendants' misrepresentations and deceptive conduct regarding the legality and safety of their products induced consumer reliance and caused Plaintiff's economic injuries. The TAC establishes that Defendants engaged in a pattern of fraudulent conduct through the issuance of false Certificates of Analysis ("COAs"), the distribution of non-compliant products, and violations of federal and state regulations. Plaintiff has sufficiently alleged claims under RICO, the Magnuson-Moss Warranty Act, and the Arkansas Deceptive Trade Practices Act, as well as her claims for products liability and rescission.

Defendants' arguments for dismissal, including assertions that Plaintiff's reliance was unreasonable, the claims lack specificity, and that economic losses are not actionable, are without merit. The TAC specifically addresses these points by identifying the who, what, when, where, and how of Defendants' fraudulent actions and by citing independent lab results and detailed consumer injury. Courts have recognized that economic harm from the purchase of mislabeled and illegal products constitutes a cognizable injury at the pleading stage.

Accordingly, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss in its entirety. Should the Court find any portion of the Complaint insufficiently pled, Plaintiff requests leave to amend the Complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure.

By: *Luther Sutter*

Luther Oneal Sutter, Esq., ARBN 95031
Lucien R. Gillham, Esq., ARBN 99199
**SUTTER & GILLHAM, P.L.L.C.**
Attorneys for Plaintiff
1501 N. Pierce, Ste. 105
Little Rock, AR 72207
501/315-1910 Office
501/315-1916 Facsimile
Luther.sutterlaw@gmail.com
Lucien.gillham@gmail.com